A. LESTER MARKS, EXECUTOR OF THE WILL AND OF THE ESTATE OF LINCOLN L. McCANDLESS, DECEASED, ET AL. *v.* WAIAHOLE WATER COMPANY, LIMITED.

No. 2494.

ARGUED APRIL 14, 1942.                    DECIDED JUNE 27, 1942.

LE BARON, J., CIRCUIT JUDGE BROOKS IN PLACE OF KEMP, C. J., DISQUALIFIED, AND CIRCUIT JUDGE MATTHEWMAN IN PLACE OF PETERS, J., DISQUALIFIED.

OPINION OF THE COURT BY LE BARON, J.
(Circuit Judge Matthewman dissenting.)

This is a motion by the defendant, appearing specially, to dismiss the writ of error herein upon the ground that the plaintiffs have failed to comply with that portion of section 3556, R. L. H. 1935, requiring a bond, conditioned for the payment of the judgment in the original cause in case of failure to sustain the writ. The defendant prevailed in the court below and obtained a judgment in the sum of $276.65.

It appears that the plaintiffs in applying for a writ of error deposited $50 with the clerk of this court and received two receipts of $25 each. The first receipt reflected a compliance with the first requirement of the section to cover costs. The second receipt for the other part of the deposit was designated, at the request of the attorney for the plaintiffs, as a "Cash Cost Bond." Thereupon the writ purportedly issued. A day subsequent thereto, the attorney secured *ex parte* from a justice of this court an order fixing the amount of bond on appeal at the sum of $25 and approving the deposit of a cash bond in that amount.

The record presents one question, *i.e.,* Does a deposit in lieu of a bond satisfy the statutory requirement of section 3556, *supra,* that "No writ of error shall issue until * * * a bond has been filed with the clerk, in favor of the prevailing party in the proceeding in which the error is alleged to have occurred, or his personal representatives, conditioned for the payment of the judgment in the original cause in case of failure to sustain the writ of error"?

Plaintiffs urge that a deposit of cash in lieu of the bond, required by section 3556, constitutes a mere "informality or insufficiency" within the meaning of that term as employed in section 3506, R. L. H. 1935, by the provisions of which "no * * * writ of error shall be dismissed for any informality or insufficiency of any bond * * *." Section 3506 assumes the posting of a bond in which the informality or insufficiency occurs. In the absence of a bond the provisions of the statute do not apply. (*Kuapuhi* v. *Pa,* 31 Haw. 623.)

A bond has certain essential characteristics without which it cannot exist. It is a written instrument in form (*Pierson* v. *Townsend,* 2 Hill [N. Y.] 550, 551), and in substance it is an obligation, contractual in nature, upon the obligor to perform its purposes, conditioned by its

terms. (*City of Tyler* v. *St. L. S. W. Ry. Co.,* 99 Tex. 491; *Laverty* v. *Cochran,* 132 Neb. 118.) The plaintiffs in applying for a writ filed nothing containing these characteristics although they are expressly indicated in the language of the statute requiring a bond to be filed.

The right to appeal is purely statutory. The provisions of section 3556 are clearly mandatory and are free of any ambiguity. That section explicitly requires as a prerequisite to the issuance of a writ of error the filing with the clerk of a bond upon specific terms and conditions. Cash in lieu thereof will not suffice. No right or option in the alternative is extended by statute to an applicant for a writ of error to deposit cash in lieu of the required bond. In the absence of a statutory provision to that effect the deposit by the plaintiffs of cash was unavailing and they stand legally in the same position as though they had done nothing. They failed to grasp the statutory opportunity extended to them to effectuate their appeal and also failed to afford the defendant the protection which the legislature intended for him to have. (*Hilo Finance* v. *De Costa,* 34 Haw. 47; *Bishop* v. *City and County,* 32 Haw. 111; *Lord* v. *Lord,* 35 Haw. 843; *W. Au Hoy* v. *Ching Mun Shee,* 33 Haw. 239; *St. L. K. & S. W. Rly. Co.* v. *Morse,* 50 Kan. 99, 105, 31 Pac. 676, 678; *In re Witt's Estate,* 100 Kan. 171, 172, 163 Pac. 797, 798.)

At this point it should be noted that although statutes providing for appeals are to be liberally construed in furtherance of the right to appeal, that right is wholly within legislative control and the court cannot go beyond the clear import of the statute to give the language a meaning not intended by the legislature, nor may it in effect legislate that which the legislature in its exclusive power did not see fit to do. (*W. Au Hoy* v. *Ching Mun Shee, supra; In re Witt's Estate, supra.*)

The complete answer to the question here raised is

found in *Ringgold* v. *Graham,* 13 S. W. (2d) [Tex.] 355, 356, in the following language: "The right to accept a deposit of cash in lieu of a bond is derived from the law, and not from the court; and where the statute requires a bond, and does not authorize a deposit in lieu thereof, the court is without authority to accept such deposit.

"* * * The appeal could only be allowed by the justice upon the filing of such a bond as the statute required, and an approval of any other would be unauthorized and of no effect. State v. White, 41 N. H. 194; Minton v. Ozias, 115 Iowa 148, 88 N. W. 336."

In that there was a failure to file the required bond, the writ did not validly issue and neither the court, nor any justice, has the power or authority to ratify its improper issuance or to waive the express requirements of the statute in respect to filing a bond.

The motion to dismiss is granted.

*A. G. M. Robertson* (Robertson, Castle & Anthony on the brief) for the motion.

*W. C. Moore* (also on the brief) contra.

DISSENTING OPINION OF MATTHEWMAN, CIRCUIT JUDGE.

This case affords an example of the importance which the legal profession is inclined to attach to the presence or absence of what Mr. Justice Cardozo termed "the precise word". In 1917, speaking for the Court of Appeals of New York, he said, in the Lady Duff-Gordon case—remembered from their law school days by many lawyers: "The law has outgrown its primitive stage of formalism when the precise word was the sovereign talisman, and every slip was fatal." (Wood v. Lucy, Lady Duff-Gordon, 222 N. Y. 88; 118 N. E. 214). Those words were used in a case based upon a contract, but the observation is far reaching in its permissible application, including statutes and wills and indeed everything where special efforts are

made to ascertain the intention behind the words used, for, after all, words are but vehicles for thought—sometimes poor ones.

The precise word here involved, upon which the water company chiefly bases its motion to dismiss is "bond", especially as that word appears in section 3506 of the Revised Laws, which section is a combination of acts of 1895 and 1905, both intended to make appellate procedure easier for the litigant seeking review.

That section—most strikingly of a remedial nature—was made to include, in 1905, motions for new trials and writs of errors, as well as bills of exceptions and appeals covered by the act of 1895, and, on the date here involved, October 1 last, provided, *inter alia,* "No . . . writ of error shall be dismissed for any informality or insufficiency of any bond, unless . . . ", etc.

The majority of the court hold that any comfort the plaintiffs in error would seek to obtain from the first of those words just quoted is prevented by the use of the word "bond" and proceed to give a strictly technical definition of that word, well known generally to most people outside of Hawaii as a "written" instrument, etc.

Counsel for the defendant in error has ridiculed the idea that a bond can be anything else than a writing and referred to a "cash bond" as an expression contradictory in its terms, indeed, an absurdity. However, on October 2, the expression was not considered by the Chief Justice of this court as a legal monstrosity. He signed an order in this very proceeding approving "the deposit of a cash bond." A fair presumption is that he did not do that "inadvertently" and "improvidently" as stated in the motion to dismiss.

For the last twenty-five years, that is, since the enactment of the amendment to what is now section 5430 of the Revised Laws, concerning bail in criminal cases, there

has been in use in Hawaii the expression "cash bond", for in that amendment the legislature made provision for a bond of just that kind, whatever the commonly accepted idea had been theretofore, here and elsewhere, as to a bond. Again, in 1929, there was enacted what is now section 5431, which begins: "All money deposited by way of bail or bond, . . . " Clearly the reference was to cash bonds then well known here for twelve years, that is, since the 1917 statute.

So, although having its origin in criminal practice, there has long been in Hawaii such a thing as a "cash bond". Certainly it is not a novelty.

"Bond" appears in each of the sections of the Revised Laws directly before the court now, section 3556—the writ of error statute—and section 3506—the statute minimizing "any informality or insufficiency" in a bond involved in appellate proceedings. It is because section 3506 is unquestionably a remedial statute—one entitled to and indeed *demanding the most liberal construction possible*— that "bond" there used may be given a meaning different from the one it usually has—and this is so independently of the fact, as just shown, that "bond" in Hawaii sometimes means a cash bond. Such departure from usual meaning is often followed when liberal—as distinguished from strict—construction is followed.

Liberally or strictly construing a statute is not to be determined by the attitude of mind of the judge passing on the question, but rather by well established rules of statutory construction or interpretation. A resort should be had to statutory construction whenever there is an ambiguity.

When one side to a legal controversy invokes statutory construction in an effort to avoid a strict application of a word or words in a statute and thus bring about a liberal construction, it almost invariably happens—as it has in

this case—that the other side contends that it is not permissible to embark upon statutory construction, for there is no ambiguity—so it is claimed—and without an ambiguity there can be no statutory construction.

"An ambiguity does not exist when there cannot reasonably be one of the meanings claimed. Usually, however, when in all honesty a difference of opinion arises as to the meaning of a statute, it may be assumed that there is an ambiguity involved, for, if not, it is unlikely that there would be a dispute as to the meaning." (Haw. Trust Co., Ltd. v. Borthwick, 35 Haw. 429, 432). One of the meanings here claimed for "bond" is the strict narrow meaning usually attached to the word. The other meaning claimed is that a requirement for a bond is satisfied in all reason by the deposit of actual money to fairly secure the litigant who obtained a money judgment in the trial court. Under this court's definition just quoted, there is then an ambiguity and resort therefore should be had to statutory construction or interpretation.

It is much too late in Hawaii to disparage statutory construction, although there is a tendency at times to ignore the subject and get away from it. On that phase alone of it which has to do with choosing strict or liberal construction of a statutory expression according to the nature of the statute involved, this court, in Hawaiian Trust Co., Ltd. v. Borthwick, 35 Haw. 429, cited over forty Hawaiian cases where the interpretation of statutory expressions was thus determined. It is fundamental that statutes intended to remedy existing difficulties should never be strictly construed, but always with the thought of carrying out the real intent of the legislature even if poorly expressed.

In courts departing from the usual meaning of words the degree of departure has sometimes been so great as to

induce findings of meanings exactly opposite to the usual ones.

· A well known case—much cited by the Supreme Court of the United States itself—is that of Church of the Holy Trinity v. United States, 143 U. S. 457 (36 Law. Ed. 226). Under the alien contract labor law Congress had made it unlawful to in any way assist or encourage the importation of any alien into the United States under contract "to perform labor or service of any kind" therein. The Church of the Holy Trinity brought into the United States one E. Walpole Warren, an alien, under contract for Warren to serve the church as its rector. To collect the penalty provided by the act of Congress, the United States brought an action against the rector, church wardens, and vestrymen of the Church of the Holy Trinity and recovered judgment for $1,000. The Supreme Court of the United States reviewed the action of the trial court and reversed its judgment. The assistant attorney general argued that the words "labor or service of any kind" were so clear cut in meaning that there was "no necessity for construction". That contention was not sustained. The court, in a unanimous decision, held that "any" did not mean any, that the service to be performed by the rector did not come within the expression "labor or service of any kind". The court said: "It must be conceded that the act of the corporation is within the letter of this section, for the relation of rector to his church is one of service, and implies labor on the one side with compensation on the other. Not only are the general words 'labor' and 'service' both used, but also, as it were to guard against any narrow interpretation and emphasize a breadth of meaning, to them is added 'of any kind;' and further, as noticed by the Circuit Judge in his opinion, the fifth section, which makes specific exceptions, among them professional actors, artists, lecturers, singers and domestic

servants, strengthens the idea that every other kind of labor and service was intended to be reached by the first section. While there is great force in this reasoning, we cannot think Congress intended to denounce with penalties a transaction like that in the present case. It is a familiar rule that a thing may be within the letter of the statute and yet not within the statute, because not within its spirit, nor within the intention of its makers. This has been often asserted and the reports are full of cases illustrating its application . . . As said in Plowden, 205: 'From which cases it appears that the sages of the law heretofore have construed statutes quite contrary to the letter in some appearance, and those statutes which comprehend all things in the letter they have expounded to extend to but some things, and those which generally prohibit all people from doing such an act they have interpreted to permit some people to do it; and those which include every person in the letter they have adjudged to reach to some persons only, which expositions have always been founded upon the intent of the Legislature, which they have collected sometimes by considering the cause and necessity of making the Act, sometimes by comparing one part of the Act with another, and sometimes by foreign circumstances' . . . In United States v. Kirby, 74 U. S. 7 Wall. 482, 486 (19 : 278, 280), the defendants were indicted for the violation of an Act of Congress providing 'that if any person shall knowingly and willfully obstruct or retard the passage of the mail, or of any driver or carrier, or of any horse or carriage carrying the same, he shall upon conviction for every such offense pay a fine not exceeding one hundred dollars'. The specific charge was that the defendants knowingly and willfully retarded the passage of one Farris, a carrier of the mail, while engaged in the performance of his duty, and also in like manner retarded the steamboat General Buell, at that time engaged in

carrying the mail. To this indictment the defendants pleaded specially that Farris had been indicted for murder by a court of competent authority in Kentucky; that a bench warrant had been issued and placed in the hands of the defendant Kirby, the sheriff of the county, commanding him to arrest Farris and bring him before the court to answer to the indictment; and that in obedience to this warrant, he and the other defendants, as his posse, entered upon the steamboat General Buell and arrested Farris, and used only such force as was necessary to accomplish that arrest. The question as to the sufficiency of this plea was certified to this court, and it was held that the arrest of Farris upon the warrant from the state court was not an obstruction of the mail, or the retarding of the passage of a carrier of the mail, within the meaning of the Act. In its opinion the court says: 'All laws should receive a sensible construction. General terms should be so limited in their application as not to lead to injustice, oppression, or an absurd consequence. It will always therefore be presumed that the Legislature intended exceptions to its language which would avoid results of this character. The reason of the law in such cases should prevail over its letter. The common sense of man approves the judgment mentioned by Puffendorf, that the Bolognian law which enacted 'that whoever drew blood in the streets, should be punished with the utmost severity,' did not extend to the surgeon who opened the vein of a person that fell down in the street in a fit. The same common sense accepts the ruling, cited by Plowden, that the statute of 1st Edward II., which enacts that a prisoner who breaks prison shall be guilty of felony, does not extend to a prisoner who breaks out when the prison is on fire, 'for he is not to be hanged because he would not stay to be burnt.' And we think that a like common sense will sanction the ruling we make, that the Act of Congress

which punishes the obstruction or retarding of the passage of the mail, or of its carrier, does not apply to a case of temporary detention of the mail caused by the arrest of the carrier upon an indictment for murder."

Another outstanding adjudication of the Supreme Court of the United States holding that it is sometimes necessary not to take the words of the law according to their ordinary meaning is the case of Hawaii v. Mankichi, 190 U. S. 197 (47 Law. Ed. 1016). The District Court of the United States for the Territory of Hawaii in habeas corpus proceedings had ordered the discharge of Osaki Mankichi who had been confined in Oahu Prison upon conviction for manslaughter. Consistently with the usual course of procedure in the Republic of Hawaii, prior to its incorporation as a territory of the United States, the prisoner had been tried upon an indictment not found by a grand jury and convicted by the verdict of nine out of twelve jurors, the other three dissenting from the verdict. That was subsequent to the Newlands Resolution of Annexation of July 7, 1898, and before the institution in Hawaii of a territorial form of government. The petition for the writ was based on the following provision in the resolution, to wit: "The municipal legislation of the Hawaiian islands, not enacted for the fulfilment of the treaties so extinguished, and not inconsistent with this joint resolution nor contrary to the Constitution of the United States, nor to any existing treaty of the United States, shall remain in force until the Congress of the United States shall otherwise determine." Mankichi claimed that for him not to be indicted by a grand jury and not to have the jury act unanimously upon his guilt was—to quote the Newlands Resolution of Annexation—"contrary to the Constitution of the United States". The lower court held with him, but, on appeal by the attorney general of Hawaii, the order of discharge on habeas corpus

was reversed by the Supreme Court and the case was remanded with instructions to dismiss the petition.

The Supreme Court distinctly held (47 Law. Ed. 1020) that, if those words in the resolution were to be taken "literally", the petitioning convict would have to be discharged—but they refused to so take the words. The court said: "If the words of the Newlands resolution, adopting the municipal legislation of Hawaii, 'not contrary to the Constitution of the United States,' be literally applied, the petitioner is entitled to his discharge, since that instrument expressly requires (Amendment 5) that 'no person shall be held to answer for a capital or otherwise infamous crime, unless on a presentment or indictment of a grand jury;' and (Amendment 6), that 'in all criminal prosecutions the accused shall enjoy the right to a speedy and public trial by an impartial jury of the state and district wherein the crime shall have been committed.' But there is another question underlying this and all other rules for the interpretation of statutes, and that is, What was the intention of the legislative body? Without going back to the famous case of the drawing of blood in the streets of Bologna, the books are full of authorities to the effect that the intention of the lawmaking power will prevail, even against the letter of the statute; or, as tersely expressed by Mr. Justice Swayne in Smythe v. Fiske, 23 Wall. 374, 380, 23 L. ed. 47, 49: 'A thing may be within the letter of a statute and not within its meaning, and within its meaning, though not within its letter. The intention of the lawmaker is the law.' A parallel expression is found in the opinion of Mr. Chief Justice Thompson of the supreme court of the state of New York (subsequently Mr. Justice Thompson of this court), in People v. Utica Ins. Co. 15 Johns. 358, 381, 8 Am. Dec. 243: 'A thing which is within the intention of the makers of a statute is as much within the statute as if it were within

the letter; and a thing which is within the letter of the statute is not within the statute, unless it be within the intention of the makers.'

Without going farther, numerous illustrations of this maxim are found in the reports of our own court. Nowhere is the doctrine more broadly stated than in United States v. Kirby, 7 Wall. 482, 19 L. ed. 278, in which an act of Congress, providing that if 'any person shall knowingly and wilfully obstruct or retard the passage of the mail, or of any driver or carrier,' was held not to apply to a state officer who held a warrant of arrest against a carrier for murder, the court observing that no officer of the United States was placed by his position above responsibility to the legal tribunals of the country, and to the ordinary processes for his arrest and detention when accused of felony. 'All laws,' said the court, 'should receive a sensible construction. General terms should be so limited in their application as not to lead to injustice, oppression, or an absurd consequence. It will always, therefore, be presumed that the legislature intended exceptions to its language, which would avoid results of this character. The reason of the law in such cases should prevail over its letter.' A case was cited from Plowden, holding that a statute which punished a prisoner as a felon who broke prison did not extend to a prisoner who broke out when the prison was on fire, 'for he is not to be hanged because he would not stay to be burned.' Similar language to that in Kirby's Case was used in Carlisle v. United States, 16 Wall. 147, 153, 21 L. ed. 426, 429.

In Atkins v. Fibre Disintegrating Co. 18 Wall. 272, 21 L. ed. 841, it was held that a suit in personam in admiralty was not a 'civil suit' within the 11th section of the judiciary act, though clearly a civil suit in the general sense of that phrase, and as used in other sections of the same act. See also Re Louisville Underwriters, 134 U. S. 488,

33 L. ed. 991, 10 Sup. Ct. Rep. 587. So in Heydenfeldt v. Daney Gold & Silver Min. Co. 93 U. S. 634, 638, 23 L. ed. 995, 996, it was said by Mr. Justice Davis: 'If a literal interpretation of any part of it (a statute) would operate unjustly, or lead to absurd results, or be contrary to the evident meaning of the act taken as a whole, it should be rejected. There is no better way of discovering its true meaning, when expressions in it are rendered ambiguous by their connection with other clauses, than by considering the necessity for it, and the causes which induced its enactment.' To the same effect are the Church of Holy Trinity v. United States, 143 U. S. 457, 36 L. ed. 226, 12 Supt. Ct. Rep. 511, in which many cases are cited and reviewed, and Lau Ow Bew v. United States, 144 U. S. 47, 59, 36 L. ed. 340, 345, 12 Sup. Ct. Rep. 517. In this latter case it was held that a statute requiring the permission of the Chinese government, and the identification of 'every Chinese person other than a laborer, who may be entitled by said treaty or this act (of Congress) to come within the United States,' did not apply to 'Chinese merchants already domiciled in the United States, who, having left the country for temporary purposes, *animo revertendi,* seek to re-enter it on their return to their business and their homes.' Said the Chief Justice: 'Nothing is better settled than that statutes should receive sensible construction, such as will effectuate the legislative intention, and, if possible, so as to avoid an unjust or an absurd conclusion.' "

Thus; in the Church of the Holy Trinity case, "any" was held not to mean any; in the Mankichi case, "nor contrary to the Constitution of the United States" was held to be a provision which might be ignored; and in the Lau Ow Bew case, "every" was held not to mean every.

The reasoning in the Lau Ow Bew case was followed in that of United States v. Gue Lim, 176 U. S. 459 (44

Law. Ed. 544) where again the question was as to whether or not there should be taken literally those same words of an act of Congress, to wit, "every Chinese person, other than a laborer". The ruling of the Supreme Court was again that "every" was not to be taken as meaning every. The court declined to accept the government's argument for a "literal construction of the section" which "would require a certificate as therein stated, from every Chinese person, other than a laborer, who should come into the country . . . " (44 Law. Ed. 547).

There is another important decision by the Supreme Court of the United States upon statutory construction arising from legislation on Chinese exclusion. It is that of Tom Hong v. United States, 193 U. S. 517 (48 Law. Ed. 772). The act of Congress then under scrutiny provided: "A merchant is a person engaged in buying and selling merchandise, at a fixed place of business, which business' is conducted in his name," etc. The court observed: "It is a fact that the testimony does not disclose, as to any of them, that the business was conducted in his name, as the literal interpretation of the law would seem to require, but it was carried on in a company name, which did not include that of any of the partners." Nevertheless the court held that it had been "established that they were bona fide 'merchants' within the meaning of the law". (48 Law. Ed. 774).

In Talbott v. Silver Bow County, 139 U. S. 438 (35 Law. Ed. 210) the question was one of interpreting a Congressional provision relating to the taxation of shares of national banks. The provision read, in material part: "but the legislature of each State may determine and direct the manner and place of taxing all the shares . . . " The Supreme Court held that the word "State" therein did not mean merely state but meant territory as well. The court conceded that its ruling was at variance with

the letter of the law. It said (35 Law. Ed. 211) : "In this section no express reference is made to Territories; States only are mentioned. Tested by the letter, the argument is short and clear."

To the foregoing quotations from decisions of the Supreme Court of the United States may be added the words quoted by Mr. Justice Harlan in the Civil Rights Cases, 109 U. S. 3 (27 Law. Ed. 836) and since then frequently requoted, as follows: " 'It is not the words of the law but the internal sense of it that makes the law; the letter of the law is the body; the sense and reason of the law is the soul.' " (27 Law. Ed. 844).

It is, of course, desirable to sustain a proposition of law by citing some adjudication "on all fours" with the matter in hand. That is seemingly urged as fully accomplished here by citing Ringgold v. Graham, a Texas case appearing in 13 S. W. (2nd series) 355. That case is said in the majority opinion to afford a "complete answer to the question here raised." However, that case is very different from the case now at bar. The two cases to be sure are alike in the one particular that there is involved in each a statute requiring the filing of a bond to secure the defendant in error as a condition precedent to the issuing of a writ of error. *If* we did not in Hawaii have the other statute, section 3506, the Texas citation would be in point. The situation here is very different, however, because we have—what Texas did not have—the remedial statute. The main question in the instant case is not the interpretation of the writ of error statute, section 3556, but the interpretation of the remedial statute, section 3506. No such question was before the Texas court in the case relied upon in the majority opinion.

An effective procedure in the logical treatment of a question is to bring about, if possible, a *reductio ad absurdum.* Sometimes that may be done by supposing ex-

treme cases. Such a case often accentuates a point. So, at the oral argument of this motion, counsel for the movant was asked if his line of argument did not lead him to the position that the deposit with the clerk of enough money to satisfy the defendant under his judgment in the trial court would not suffice in lieu of the statutory bond. He frankly admitted that such was his argument. A bond is to secure the payment of money and, as a mere means to an end, it can hardly be as good as the end itself, the money. In the trial court the defendant there obtained a judgment for costs for $276.65. The same party, the defendant in error here, in pressing its motion to dismiss the writ of error, contends that the plaintiffs in error should have filed a bond to secure to the defendant in error $276.65—and that nothing but a bond would suffice, not even the money itself.

The movant makes no legal objection in this motion to the inadequacy of $25 as security for $276.65. Its position seems to be that if a written bond for $25 had been filed, it would not have asked for dismissal but for an "order . . . directing an amendment for such bond to be made or a new bond to be filed within a specified time, not less than twenty-four hours", in accordance with section 3506. In other words the fatal misstep of the plaintiffs in error was not in depositing $25 instead of $276.65, but in putting down real money instead of a bond. The position of the defendant in error is that it would not have moved to dismiss if a written bond for $25 or even $1 had been filed, but would have done so if a certified check for $276.65, or that amount in money itself, had been deposited with the clerk to secure the payment of the judgment of the lower court. Clearly that is a *reductio ad absurdum*.

Section 14 of the Revised Laws requires that, in ascertaining the meaning of a law, "every construction which

leads to an absurdity should be rejected." In Stewart et al. v. Spalding, 25 Haw. 644, 645, this court ruled, as to the necessity of the plaintiff in error filing a bond for judgment rendered in the trial court under the writ of error statute, what is now section 3556: "This is a clear case calling for the application of the rule which requires that the spirit and reason of the statute shall prevail over the strict letter thereof." Again the court should subordinate the "strict letter" of the statute to its "spirit and reason". (Rev. Laws, sec. 13).

Being exact generally connotes care and accuracy, but being exact along meticulous lines often leads into the realm of technicalities. While genuine exactness, of course, is to be commended, there should always be avoided—notwithstanding its specious appeal—what that eminent Supreme Court jurist, Mr. Justice Holmes, so strongly deplored as "delusive exactness". In Truax v. Corrigan, 257 U. S. 312, 342 (66 Law. Ed. 254, 267), he observed, "Delusive exactness is a source of fallacy throughout the law."

It was the same learned jurist who years before had said that it was necessary to "avoid being deceived by a form of words", and so held that while generally "a mere grant of the ahupuaa without mention of the fishery would not convey the fishery", nevertheless, in the case before him, "land", as used in a grant, did not mean merely land but meant "land and fishery" as well. Damon v. Hawaii, 194 U. S. 154, 161 (48 Law. Ed. 916, 917).

I adopt as my own words here the concluding words of Mr. Justice Le Baron of this court in the two cases of Carey v. The Discount Corporation, Limited et al., decided but a few days ago, to wit: "To my mind, the majority opinion is overtechnical and not only does violence to the sound public policy as enunciated above, but also, in attempting to ascertain the intention of the legislature,

disregards well-established rules long followed by this court in the construction of statutes".

The motion to dismiss should be denied with the idea of bringing about, along with security for the defendant in error, a full and fair opportunity for the plaintiffs in error to have this court review the alleged errors of the trial court. The lawmaking body, by its distinctly remedial legislation, so intended.