462 P.2d 199 (1969)
Charles E. DALTON, Eva Ann Dalton, Henry E. Drayton, Jr., Joanne S. Drayton, William M. Swope and Mary Louise Swope, Plaintiffs-Appellants, Cross-Appellees,
v.
CITY AND COUNTY OF HONOLULU, a municipal corporation, et al., Defendants-Appellees, Cross-Appellants.
No. 4852.
Supreme Court of Hawaii.
November 26, 1969.
As Amended on Denial of Rehearings December 31, 1969.
*201 William M. Swope, Honolulu, for plaintiffs-appellants, cross-appellees.
Michael Doran, Deputy Corp. Counsel (Paul Devens, Corp. Counsel, and Richard Hirai, Deputy Corp. Counsel, with him on the brief), for defendant-appellee, City and County of Honolulu.
Felix Maciszewski, Honolulu (James W. Boyle, Honolulu, with him on the briefs; Carlsmith, Carlsmith, Wichman & Case, Honolulu, of counsel), for defendants-appellees, cross-appellants Kaelepulu Co., Inc., and others.
Gary L. Wixom, Honolulu (Allen M. Stack, Honolulu, with him on the brief; Pratt, Moore, Bortz & Case, Honolulu, of counsel), for defendant-appellee Lewers & Cooke, Inc.
Before RICHARDSON, C.J., ABE, LEVINSON and KOBAYASHI, JJ., and HAWKINS, Circuit Judge, in place of MARUMOTO, J., disqualified.
KOBAYASHI, Justice.
Plaintiffs filed suit on March 6, 1968. The amended complaint seeks (1) a declaratory judgment that Honolulu Ordinances 2840, 2841, 2913 and 3131 are null and void, and (2) an injunction restraining enactment of further ordinances relating to the land in question.
Jurisdiction in the circuit court was apparently based upon HRS § 632-1 and H.R.C.P. Rule 57.
Ordinances 2840 and 2841 were approved August 25, 1966. Ordinance 2840 purports to amend the General Plan of the City and County of Honolulu by changing the permitted land use for a 46.922 acre area of land in Kailua from residential and agricultural uses to medium density apartment use. Ordinance 2841 purports to make the same change in the General Plan Detailed Land Use Map. The effect of these ordinances was to permit the county to rezone the land in question, i.e., they did not in and of themselves rezone the land, rather they permitted subsequent ordinances rezoning the land to be considered.
Approximately 35 acres of the land in question are owned by the Castle Estate. Defendants Kailua Gardens and Lewers & Cooke were, at the time the suit was filed, the lessee and developer of the 35 acre Castle land. The remaining 11 acres are owned by the Bishop Estate. Defendants Kaelepulu and Island Construction were lessee and developer of the 11 acre Bishop land.
Ordinance 2913, approved December 28, 1966, took advantage of the amendments to the general plan to rezone the 37.197 acres (evidently this is the Castle land), from Rural Protective to Apartment District C. Similarly, Ordinance 3131, approved February 21, 1968, rezoned 10.969 acres[1] (evidently this is the Bishop land) from Rural Class AA Residential to Apartment District C.
Defendant City and County of Honolulu (hereinafter county) enacted the ordinances in question.
Between September 24 and October 28, 1968, all parties made or joined in motions for summary judgment. On October 28, 1968, argument of the motions was heard. From the bench, the trial court denied plaintiffs' motion, and granted defendants' *202 motions. The trial court ruled that "all of these ordinances are constitutional and valid." In granting the motion of defendant Lewers & Cooke, the trial court stated that the motion "is granted on every ground as set forth in the memorandum submitted, including laches and waiver on Page 4."
On November 4, 1968, the court entered a judgment upholding the validity of Ordinances 2913, 2840 and 2841. On December 20, 1968, the court entered a judgment upholding the validity of Ordinances 3131, 2840 and 2841.
In support of their motion for summary judgment, defendants Kaelepulu and Island Construction argued that plaintiffs lacked standing to sue. The trial court ordered Kaelepulu and Island Construction to delete reference to the defense of standing from their order and judgment.
Plaintiffs appeal from the denial of their own motion and from the granting of defendants' motions. Defendants Kaelepulu and Island Construction cross-appeal from the trial court's rejection of their argument that plaintiffs lacked standing.
Jurisdiction in this Court is based upon HRS § 632-2 and H.R.C.P. Rule 73.
The issues to be resolved by this appeal are standing, laches, and the validity of the ordinances.

I. Standing
Defendants Kaelepulu and Island Construction argue in their cross-appeal that the trial court erroneously required them to delete the ground of standing from their summary judgment order. Earlier, the county urged lack of standing in a motion to dismiss, which was denied by Judge Ogata, but the county has not appealed on this ground.
The standing necessary to pursue a declaratory judgment is described in HRS § 632-1:
Controversies involving the interpretation of * * * statutes, municipal ordinances, and other governmental regulations, may be so determined, and this enumeration does not exclude other instances of actual antagonistic assertion and denial of right.
Relief by declaratory judgment * * may be granted in all civil cases where an actual controversy exists between contending parties, * * * or where in any such case the court is satisfied that a party asserts a legal relation, status, right, or privilege in which he has a concrete interest * * *. [Emphasis added]
Plaintiffs' interest in this case is that they "reside in very close proximity" to the proposed development. In fact two of the plaintiffs apparently "live across the street from said real property" upon which defendants plan to build high rise apartment buildings, thus restricting the scenic view, limiting the sense of space and increasing the density of population. Clearly this is a "concrete interest" in a "legal relation". Lynch v. Borough of Hillsdale, 136 N.J.L. 129, 54 A.2d 723 (1947); see generally 3 Davis, Administrative Law Treatise 283-285 (1958). Clearly, too, this is an "actual controversy", not merely a hypothetical problem.
Accordingly, we affirm the trial court's ruling that plaintiffs have standing to challenge the validity of the ordinances in question.

II. Laches
It appears from the transcript that the ground of laches for summary judgment was urged only by defendant Lewers & Cooke.[2] Therefore, laches was held to apply *203 only with respect to the 35 acre Castle land which was rezoned on December 28, 1966. At oral argument before this Court, counsel for Kaelepulu and Island Construction conceded that laches would not apply to the 11 acre Bishop land, which was rezoned February 21, 1968. Thus one of the issues on this appeal is whether plaintiffs are barred by laches from contesting the validity of the ordinance rezoning the 35 acre Castle land.
The standard for granting a summary judgment is contained in H.R.C.P. Rule 56:
The judgment sought shall be rendered forthwith if the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. [Emphasis added]
The facts relevant to the issue of laches are:
1. The affidavit of plaintiff William H. Swope states that (a) he examined the Kailua Gardens file in the office of the planning commission shortly after the approval of Ordinances 2840 and 2841 on August 25, 1966; (b) he "met with the planning director and was informed by him that access and street problems were delaying the project because the fee simple owner of a proposed roadway would not grant an easement."
2. Ordinance 2913 was approved December 28, 1966, rezoning the 37.197 acres (the Castle land) from Rural Protective to Apartment District C No. R-17.
3. On February 27, 1967 Mr. Swope wrote a letter to Messrs. Tharp, Vanatta and Wong, partners in Kailua Gardens. This letter clearly states objection to the project, and suggests "a conference in the near future to avoid possible court action." Mr. Tharp's affidavit acknowledges receipt of the letter, and states that he spoke with Mr. Swope "within the next few days", advising him (a) that Kailua Gardens was "in the process of exercising their option with L.W. Campos Ranch, Ltd. to secure its lease on the Campos Dairy property in Kailua and negotiating with Harold Kainalu Long Castle to extend the term of said lease;" (b) that Mr. Walter G. Chuck was conducting these negotiations, and (c) that Mr. Swope should contact Mr. Chuck. Mr. Swope's affidavit states that after talking with Mr. Tharp he "did contact Mr. Chuck and raised his objections over the proposed project."
Mr. Tharp also states that he told Mr. Swope that Kailua Gardens was negotiating with Lewers & Cooke for a development agreement. Mr. Swope states that he "was not informed by Mr. Tharp that Kailua Gardens * * * [and others] were negotiating with Lewers & Cooke," that he "learned of negotiations with Lewers & Cooke, Inc., after a public announcement appeared in the newspapers",[3] and that he "believed that Lewers & Cooke, Inc., had knowledge of [his] letter" to Kailua Gardens when it acquired the development rights from Kailua Gardens.
4. Mr. Tharp further states, that (a) on March 29, 1967, he and some of his partners agreed to purchase from Campos Ranch its leases with Castle for $1,370,000; (b) on March 29, 1967, Kailua Gardens (as general partner of Kailua Towers) entered into the leases with Mr. Castle; (c) on March 30, 1967, Kailua Gardens (as general partner of Kailua Towers) entered into a development agreement with Lewers & Cooke.
5. The affidavit of R. Gibson Rietow, an officer of Lewers & Cooke, states:
* * * * * *
4. That he was at no time notified from any source of any possibility of a *204 suit concerning the zoning of the parcel until the filing [of the suit] * * * on March 6, 1968, * * *.
6. From the affidavit of a second Lewers & Cooke officer, it appears that between January 1, 1967, and March 30, 1968, Lewers & Cooke spent about $570,000 on the project, including $400,000 paid to Kailua Gardens pursuant to the development agreement of March 30, 1967.
7. From the affidavit of a third Lewers & Cooke officer, it appears that Lewers & Cooke (a) is obliged by the development agreement to pay Kailua Gardens $970,000 (in addition to the $400,000 already paid); (b) is obliged by the development agreement "to perform the development obligations of Kailua Towers" including the duty "to place improvements on the land" with a value of at least $9,000,000 between 1970 and 1976; and (c) "has committed itself to pay $50,000 toward the widening of Kailua Road."
The material facts as to which there is no genuine issue are: (a) Mr. Swope made known his objections to Kailua Gardens on February 27, 1967, within two months of the approval of Honolulu Ordinance 2913 which rezoned the land in question and plaintiffs filed this suit on March 6, 1968; (b) Lewers & Cooke entered in a development agreement with Kailua Gardens on March 30, 1967; and (c) by March 30, 1968, Lewers & Cooke had spent over $500,000 on the project, and was obliged to spend over $9,000,000 more over the next eight years, most of which was paid or is due under the development agreement of March 30, 1967, with Kailua Gardens.
The affidavits of Mr. Swope and Mr. Tharp are in direct conflict as to whether or not Tharp told Swope in February or early March, 1967, that Kailua Gardens was negotiating with Lewers & Cooke. This is certainly a material fact as to which there is a genuine issue necessitating a trial. Waterhouse v. Capital Investment Co., 44 Haw. 235, 249, 353 P.2d 1007, 1016 (1960).
On summary judgment the inferences to be drawn * * * must be viewed in the light most favorable to the party opposing the motion.
United States v. Diebold, Inc., 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962); Traylor v. Black, Sivalls & Bryson, Inc., 189 F.2d 213, 216 (8th Cir.1951); Doehler Metal Furniture Co. v. United States, 149 F.2d 130, 135 (2d Cir.1945); Arnstein v. Porter, 154 F.2d 464, 468 (2d Cir.1946) ["slightest doubt"]; Paul E. Hawkinson Co. v. Dennis, 166 F.2d 61, 63 (5th Cir.1948) ["beyond the peradventure of a doubt"]. Therefore Swope's affidavit must be accepted for the purpose of determining defendants' motion for summary judgment. We must assume therefore that plaintiffs did not know of Lewers & Cooke's interest in the project until sometime after March 30, 1967, on which date Lewers & Cooke entered the development agreement with Kailua Gardens. The great bulk of the damage alleged by Lewers & Cooke consists of obligations under this agreement. This damage could be held attributable to plaintiffs only on a theory that they were obliged to give notice to all unknown persons who might be interested in the project even before such unknown persons had obligated themselves.[4] We are quite reluctant to consider such a novel theory, particularly since it was not articulated by the trial court, nor is there any support for it in defendants' briefs. Kennedy v. Silas Mason Co., 334 U.S. 249, 257, 68 S.Ct. 1031, 92 L.Ed. 1347 (1948).
It is therefore necessary that this case be remanded for trial on the question *205 of whether plaintiffs are barred by laches from contesting the validity of the rezoning of the 35 acre Castle land. A decision after trial "will serve to bring into sharper focus certain issues of importance"[5] which were passed over by the grant of summary judgment.

III. Validity of the Amendments to the General Plan
Plaintiffs contend that Ordinances 2840 and 2841, which purport to amend the general plan, are null and void. At first blush, HRS § 201-23 would seem to dispose of plaintiffs' contention:

The general plan may be amended within any county by the director with the board or council approving the amendment by ordinance. The county may after consulting with the director amend the general plan by ordinance. [Emphasis added]
However, Act 225, 1955 General Session, which authorized the creation of the commission which drafted the present Honolulu Charter, provided in § 6 that:
Upon such ratification [by the legislature after approval by the electorate], the charter shall become the organic law of the city and county of Honolulu and shall supersede any existing charter and all laws affecting the organization and government of the city and county which are in conflict therewith.
The present charter was approved by the electorate and ratified by the legislature. Act 261, 1959 General Session. Therefore the charter supersedes all laws in conflict therewith, including HRS § 201-23.
Defendants recognize that the charter supersedes conflicting statutes, and rely upon § 3-204 of the charter[6] itself:
1. No ordinance shall be amended, * * * by the council except by ordinance. * * *
2. Any ordinance * * * may be repealed by reference to its number or section number. Revisions or amendments may be made in the same manner * * *.
Defendants contend that the general plan was enacted as an ordinance, and that Ordinances 2840 and 2841 were a proper exercise of the county's general power to amend ordinances.
A. Plaintiffs argue that the general plan is not subject to the general power of amendment because such amendments are antithetical to Honolulu Charter § 5-509, which requires that the general plan be "long-range" and "comprehensive". Section 5-509 provides:
The general plan shall set forth the council's policy for the long-range, comprehensive physical development of the city. The general plan shall include a map of the city and shall contain a statement of development objectives, standards and principles with respect to the most desirable use of land within the city for residential, recreational, agricultural, commercial, industrial and other purposes; the most desirable density of population in the several parts of the city; a system of principal thoroughfares, highways, streets and other public open spaces; the general location, relocation and improvement of public buildings; the general location and extent of public utilities and terminals, whether publicly or privately owned, for water, sewers, light, power, transit and other purposes; the extent and location of public housing projects; adequate drainage facilities and control; and such other matters as may, in the council's judgment, be beneficil to the city. The plan shall be based upon studies of physical, social, economic and governmental conditions and trends and shall be designed to assure the coordinated development of the city and to *206 promote the general welfare and prosperity of its people. [Emphasis added]
The meaning of "long-range" and "comprehensive" is clarified by reference to (1) expert testimony received by the charter commission in formulating § 5-509, and (2) the supporting data of the general plan submitted by the planning commission to the council.
Shortly before adopting the requirement that the general plan be "long-range" and "comprehensive",[7] the charter commission solicited and received the advice of a city planning expert:
He believed that it should be the primary responsibility of the planning department to study, prepare and maintain a long range comprehensive general plan to guide the physical development of the city on a current basis, which would be recommended to the planning commission for further study and which in turn, if agreed on, would be recommended for adoption by the policy body. He believed it very important that the development and carrying out of the general plan be spelled out in the charter, explaining that such a plan should, of course, look forward to the needs of the community not for just one or two years but twenty years hence, and which would have to do with matters of traffic, police, fire, schools and playgrounds, land use, etc. Without a general plan, which is also a policy statement concerning zoning and subdivisions, there could be no long-range planning.
Minutes of the 64th Meeting of the Charter Commission held March 25, 1957, p. 2, on file in the Public Archives, at Honolulu, State of Hawaii.
In the supporting data of the 1964 general plan, p. 48, it is stated:
Land uses proposed in this report and designated on Plate [sic] 39, the General Plan for the City and County of Honolulu, cover the next 20 years  as far ahead as it is safe to predict.
B. To insure that the general plan would be "long-range" and "comprehensive", stringent procedural hurdles were required to be overcome before a general plan could be adopted. These hurdles are:
§ 5-503. * * * The planning director shall:
(a) Prepare a general plan and development plans for the improvement and development of the city.
* * * * * *
§ 5-505. * * * The planning commission shall:
* * * * * *
(b) Review the general plan and development plans and modifications thereof developed by the director. The commission shall transmit such plans with its recommendations thereon through the mayor to the council for its consideration and action. The commission shall recommend approval in whole or in part and with or without modifications or recommend rejection of such plans.
* * * * * *
§ 5-512. * * *

*207 1. The council shall adopt the general plan or any development plan by ordinance. * * *
* * * * * *
4. Any addition to or change in the general plan proposed by the council shall be referred by resolution to the planning director and the planning commission for their recommendation prior to final action by the council. If the commission disapproves the proposed change or addition, or recommends a modification thereof, not accepted by the council, or fails to make its report within the period of thirty days, the council may nevertheless adopt such addition or change, but only by the affirmative vote of at least two-thirds of its entire membership.
The general power to amend ordinances (relied upon by defendants) contains none of these protections. Plaintiffs argue that since the general plan was adopted pursuant to a process containing special safeguards, the general power of amendment which does not contain these safeguards should not be held applicable to the general plan.
The effect of these special procedures, applicable only to the general plan, is that when the general plan is submitted to the council, the council is powerless to make additions or changes without first referring its additions or changes to the planning director and the planning commission for their recommendation. Without their recommendation, the council may adopt such additions or changes "only by the affirmative vote of at least two-thirds of its entire membership."
These stringent requirements for initial adoption of the general plan would be pointless if the council's general power to amend were held applicable to the general plan. For example, suppose that after the general plan had been prepared and recommended to the council, five of the nine members of the council proposed to change the plan. Charter § 5-512, subd. 4 would require that this proposal be referred by resolution to the planning director and the planning commission. Without the approval of the commission, the five councilmen would be powerless to adopt the change. But if the general plan could be amended as the defendants here contend, the five councilmen could join the other councilmen and adopt the general plan without proposing any changes, and thereafter, the five councilmen could promptly amend it in any manner they wished, subverting the limitation expressed in charter § 5-512, subd. 4.
C. Charter § 5-512, subd. 2 provides in pertinent part:
No * * * zoning ordinance shall be initiated or adopted unless it conforms to and implements the general plan. * * *
This section attempts to avoid the
danger that zoning, considered as a self-contained activity rather than as a means to a broader end, may tyrannize individual property owners.
Haar, "In Accordance with a Comprehensive Plan", 68 Harv.L.Rev. 1154 at 1158 (1955). It puts teeth into the requirement that the general plan be "long-range" by providing a test for courts to use in reviewing zoning ordinances, i.e., if a zoning ordinance does not "conform to and implement" the general plan, then the city did not have the power to adopt it.
In the context of the present case § 5-512, subd. 2 would have prevented the city from adopting Honolulu Ordinances 2913 and 3131 without first amending the general plan, since clearly Ordinances 2913 and 3131 do not conform to the unamended general plan. To allow the city to amend the general plan (under its general power to amend ordinances) and then adopt a zoning ordinance contrary to the unamended general plan, is to allow the city to accomplish by two ordinances exactly what the charter sought to prohibit.
D. The charter commission's first draft § 4-902 expressly gave to the council the power to amend the general plan:
In addition to its other powers and duties, the Council shall:
1. Adopt and from time to time review and, if necessary, amend a general *208 plan for the improvement and development of the City and County, * * *
* * * * * *
The charter commission eliminated this provision from later drafts of the charter.
The charter commission's first draft § 4-909 provided:
1. The Council may adopt the General Plan as a whole or may from time to time adopt a part or parts thereof by resolution. * * *
2. After the adoption of the General Plan or any part thereof, no public improvement or project * * * shall be initiated unless it conforms to the General Plan * * *.
* * * * * *
These provisions were significantly altered before they eventually became § 5-512 of the charter:
1. The council shall adopt the general plan or any development plan by ordinance. The general plan and all development plans shall be kept on file in the office of the planning department.
2. No public improvement or project, or subdivision or zoning ordinance shall be initiated or adopted unless it conforms to and implements the general plan. * *
* * * * * *
Notice that: (1) The reference in the first draft to adopting anything less than a whole general plan was eliminated; and (2) At the same time, the restrictive clause in the first draft § 4-909.2 was expanded to prohibit adoption of zoning ordinances contrary to the general plan.
Clearly then, the charter commission considered giving the council an unlimited power to amend the general plan and to adopt zoning ordinances. Ultimately, however, the charter commission rejected the sections granting the council the power to amend the general plan, and wrote into the charter a specific prohibition against zoning ordinances which do not conform to and implement the general plan.
E. Defendants place great reliance upon charter § 5-515:
1. Prior to the adoption of the general plan or the subdivision and zoning ordinances, or any amendments thereto, the council may hold a public hearing thereon at which interested persons shall be afforded a reasonable opportunity to be heard. * * *
2. Prior to recommending the adoption of the general plan and any development plan or any subdivision or zoning ordinance or any amendments thereto, and prior to the adoption of subdivision regulations or any amendments thereto, the planning commission shall hold a public hearing thereon at which interested persons shall be afforded a reasonable opportunity to be heard. * * *
* * * [Emphasis added]
Defendants argue that "or any amendments thereto" refers to "the general plan" in § 5-515, subd. 1.
A careful review of the legislative history of § 5-515 and of the other pertinent sections of the charter compels this Court to conclude that the amendment process must meet certain strict procedural hurdles. Looking at the totality of the problem before us with the whole of Honolulu as one indivisible unit, we conclude that the better and correct interpretation of charter § 5-515 requires that in the process of amending the general plan, not only a public hearing is necessary but the council, the planning commission and the planning director are required to follow a course of conduct consistent with the safeguards that were required in the initial adoption of the general plan. This interpretation will not only meet the spirit of the law but fulfill the true intent of the laws covering the general plan.
We conclude that the city's general power to amend ordinances is not applicable to the general plan. The purpose of Honolulu Charter § 5-509 was to prevent the deterioration of our environment by forcing the city to articulate long-range comprehensive planning goals. The purpose *209 of Honolulu Charter § 5-512, subd. 2 was to prevent the compromise of these planning goals. These sections of the charter allow less room for the exertion of pressure by powerful individuals and institutions. To allow amendment of the general plan without any of the safeguards which were required in the adoption of the general plan would subvert and destroy the progress which was achieved by the adoption of the charter's sections on planning, and by their effectuation in the 1964 general plan.
We hold that the safeguards specified by the charter as applicable to the adoption of the general plan must be followed in altering the general plan. The record in this case shows that the county failed to follow a course of conduct consistent with the safeguards that are required in the initial adoption of the general plan. These safeguards require that alterations in the general plan must be comprehensive and long-range. More specifically, if the city believes the general plan of 1964 is obsolete, then comprehensive updating of the 1964 plan's "studies of physical, social, economic and governmental conditions and trends" is in order. If new study reveals, among other things, (a) a housing shortage that was underestimated in the 1964 general plan, (b) the most rational solution to this housing shortage is more apartments, (c) some of these new apartments should most rationally be in Kailua, (d) the land set aside in the 1964 general plan for apartments in Kailua must be increased to meet this need, and (e) the acreage in question in this case is the best site for additional apartments (rather than some other site, or rather than some other use for this land to fit some other need underestimated in the 1964 plan); then the general plan may be amended to permit a change in zoning. The vice of the amendment to the general plan questioned by this suit is precisely that it did not consider these alternatives.
Since the trial courts' grant of summary judgment for defendants was erroneous, we reverse. Plaintiffs' motion for summary judgment should have been granted with regard to the 11 acre Bishop land. We remand for entry of judgment for plaintiffs and against those defendants concerned with the 11 acre Bishop land.
With regard to ordinances 2840, 2841 and 2913, as they affect the 35 acre Castle land, a trial is necessary on the issue of laches, therefore the case is remanded to the circuit court. If laches applies, with regard to ordinance 2840 and 2841 or with regard to ordinance 2913, the judgment should be entered for the defendants concerned with the 35 acre Castle land and the validity of said ordinances 2840, 2841, 2913, as they affect the 35 acre Castle land shall be a legal fact and be unquestioned. If, however, laches does not apply, then judgment should be entered for plaintiffs.
ABE, Justice, dissenting, with whom HAWKINS, Circuit Judge, joins.
The majority of the court holds that Ordinances 2840 and 2841, which purported to amend the general plan for the City and County of Honolulu, are null and void. I dissent from the majority decision.
The majority in its opinion holds that "the better and correct interpretation of charter § 5-515 requires that in the process of amending the general plan, not only a public hearing is necessary but the council, the planning commission and the planning director are required to follow a course of conduct consistent with the safeguards that were required in the initial adoption of the general plan."
A study of the Charter shows that §§ 3-204 and 5-515 are applicable to the amendment of the general plan which was duly adopted by an ordinance.
The general plan for the City and County of Honolulu was duly adopted by the City Council on May 7, 1964, as Ordinance No. 2443.[1]
*210 It would then follow that the general plan as an ordinance would be subject to the general power of the council to revise or repeal ordinances under the provisions of § 3-204,[2] however, subject to the provisions of § 5-515 of the Charter.
The pertinent portion of § 5-515 reads:
"1. Prior to the adoption of the general plan and any development plan or the subdivision and zoning ordinances, or any amendments thereto, the council may hold a public hearing thereon at which interested persons shall be afforded a reasonable opportunity to be heard. Notice of the time and place of the hearing shall be published at least ten days prior to such hearing in a daily newspaper of general circulation in the city.
2. Prior to recommending the adoption of the general plan and any development plan or any subdivision or zoning ordinance or any amendments thereto, and prior to the adoption of subdivision regulations or any amendments thereto, the planning commission shall hold a public hearing thereon at which interested persons shall be afforded a reasonable opportunity to be heard. Notice of the time and place of the hearing shall be published at least ten days prior to such hearing in a daily newspaper of general circulation in the city."
As I interpret the provisions of § 5-515, before the general plan can be amended the planning commission is mandated to hold a public hearing before it makes a recommendation to the city council for any amendment to the general plan and the council may hold a public hearing.
The record shows that the planning commission held a public hearing on the two ordinances at Kailua on June 2, 1966, after notice of the public hearing was duly published in the Honolulu Advertiser and the Honolulu Star-Bulletin on May 22, 1966. The record also shows that the notice of the public hearing was sent to applicable governmental agencies, three community associations and owners and lessees of the land under consideration for change. There is no question that the planning commission met all of the requirements of § 5-515 before recommending the adoption of the amendment to the general plan.
Then Ordinance Nos. 2840 and 2841 were enacted by the City Council by votes as follows:
First reading  9 ayes, 0 no
Second reading  9 ayes, 0 no
Third reading  8 ayes, and 1 absent.
The record shows that no public hearing was held by the council prior to the enactment of the ordinances; however, § 5-515, I believe, gives the council discretion as to the holding of a public hearing; and thus, it must be deemed that the action of the council was valid and legal under § 5-515.
Section 5-515 clearly states the requirement of the amending procedure of the general plan; and it is difficult to understand the majority's act of reading into the section other procedural requirements not provided for therein  namely, that the same procedural steps be taken for the enactment of an ordinance amending the general plan as required for the adoption of the general plan. The majority holds that the amendment procedures must meet "stringent procedural hurdles" such as:
"§ 5-503. * * * The planning director shall:
(a) Prepare a general plan and development plans for the improvement and development of the city.
* * * * * *
§ 5-505. * * * The planning commission shall:
* * * * * *
(b) Review the general plan and development plans and modifications thereof *211 developed by the director. The commission shall transmit such plans with its recommendations thereon through the mayor to the council for its consideration and action. The commission shall recommend approval in whole or in part and with or without modifications or recommend rejection of such plans.
* * * * * *
§ 5-512. * * *
1. The council shall adopt the general plan or any development plan by ordinance. * * *
* * * * * *
4. Any addition to or change in the general plan proposed by the council shall be referred by resolution to the planning director and the planning commission for their recommendation prior to final action by the council. If the commission disapproves the proposed change or addition, or recommends a modification thereof, not accepted by the council, or fails to make its report within the period of thirty days, the council may nevertheless adopt such addition or change, but only by the affirmative vote of at least two-thirds of its entire membership."
The intent of the drafters of the Charter may have been as stated by the majority, that is, quoting the majority decision:
"For example, suppose that after the general plan had been prepared and recommended to the council, five of the nine members of the council proposed to change the plan. Charter § 5-512, subd. 4 would require that this proposal be referred by resolution to the planning director and the planning commission. Without the approval of the director and commission, the five councilmen would be powerless to adopt the change. But if the general plan could be amended as the defendants here contend, the five councilmen could join the other councilmen and adopt the general plan without proposing any changes, and thereafter, the five councilmen could promptly amend it in any manner they wished, subverting the limitation expressed in charter § 5-512, subd. 4"
Now, assuming what has been said by the majority of the court is correct, is it for this court to read provisions into the section to prevent this? Was it not the responsibility of the drafters of the Charter to write into § 5-515 that procedural requirement specifically? I believe where a legislative body has failed, this court should not legislate even to prevent evil because "it is not for this court to usurp legislative power and enter into the legislative field. Pillsbury v. United Engineering Co., 342 U.S. 197, 72 S.Ct. 223, 96 L.Ed. 225 (1952); State v. Moeller, 50 Haw. 110, 433 P.2d 136 (1967); Marks v. Waiahole Water Co., 36 Haw. 188 (1942); People v. Olah, 300 N.Y. 96, 89 N.E.2d 329, 19 A.L.R.2d 219 (1949)." A.C. Chock, Ltd. v Kaneshiro, 51 Haw. 87, 93, 451 P.2d 809, 813 (1969).
The majority, I believe, attempts to justify its interpretation of § 5-515 on the ground that as interpreted the section will "fulfill the true intent of the laws covering the general plan." However, as we have said in Public Utilities Commission v. Narimatsu, 41 Haw. 398 (1956) at page 401:
"As to the general rule applicable in the construction of statutes there can be no doubt. The object is always to ascertain and give effect to the intention of the legislature. `This intention, however, must be the intention as expressed in the statute, and where the meaning of the language is plain, it must be given effect by the courts, * * *.' 36 Cyc. 1106, 1107." (Irwin v. Ahia, 29 Haw. 1, 5.) "The intention of the legislature is to be obtained primarily from the language used in the statute. * * * Where the language of the statute is plain and unambiguous there is no occasion for construction and the statute must be given effect according to its plain and obvious meaning." (Kauai v. McGonagle, 33 Haw. 915, 920.)
Confronted with the plain and unambiguous statutory requirement that *212 "The term `taxicab' * * * shall mean * * * any vehicle * * * transporting passengers * * * between such points as may be directed by the passengers." (§ 4701, supra), we are unable to accept the construction of the statute urged by the respondents because "* * * quod voluit non dixit. What was intended was not expressed." (Castle & Cooke v. Luce, 5 Haw. 321, 324.) "While it is always the aim of courts to so construe statutes as to carry out the intention of the legislature, that intention in order to be given effect must be expressed in the statute or reasonably appear from the language used." (Territory v. Choy Dan, 20 Haw. 1, 3); "`but a statute should not be extended beyond the fair and reasonable meaning of its terms because of some supposed policy of the law, or because the legislature did not use proper words to express its meaning.' [36 Cyc. 1112, 1113.] * * *. If it has turned out that the application of [the statute] * * * has not accomplished but defeated the unexpressed purpose of the legislature the remedy is not with us but with the law making body." (Honolulu Rapid Transit Co. v. Wilder, 30 Haw. 685, 690.) (Emphasis added.)"
The planning commission and the city council have met all of the requirements for amending the general plan and I would hold that Ordinance Nos. 2840 and 2841 valid and legal.
Even assuming that for the purpose of amending the general plan, the same procedural steps are required as for the adoption of the general plan, as set forth in the majority opinion, I believe all of the hurdles were met or overcome.
The record shows that applications for the amendment to the general plan were filed by the land owners or developers with the planning director. After receiving these requests, the inter-office memos in the record show that studies were made in connection with these applications. Thereafter, these requests, together with the studies, were referred by the planning director to the planning commission. The commission on May 5, 1966, set a public hearing on the matter at Kailua for June 2, 1966.
Further, as stated above, notice of the public hearing was duly given and the public hearing was duly held on June 2, 1966. After the hearing, the planning commission acted favorably and recommended amendments to the general plan, subject to construction of adequate streets. The commission submitted drafts of the proposed amendments to the corporation counsel on July 28, 1966, who submitted the draft of the ordinances to the council on August 1, 1966. The ordinances passed third reading on August 25, 1966, with eight aye votes, no nay vote and one absent, thus the ordinances passed with more than two-third votes of its entire membership, thereby meeting the requirements even where the planning commission had originally disapproved the proposed changes to the general plan prior to its approval.
The record shows studies were made in connection with the applications for amendments to the general plan and in the absence of proof to the contrary, it should be deemed that the planning commission and the city council considered that the general plan adopted in 1964 to be obsolete; that comprehensive "studies of physical, social, economic and governmental conditions and trends" were made; that the new study revealed, among other things, "(a) a housing shortage that was underestimated in the 1964 general plan, (b) the most rational solution to this housing shortage is more apartments, (c) some of these new apartments should most rationally be in Kailua, (d) the 67 acres set aside in the 1964 general plan for apartments in Kailua must be increased to meet this need, and (e) the acreage in question in this case is the best site for additional apartments (rather than some other site, or rather than some other *213 use for this land to fit some other need underestimated in the 1964 plan) * *."[3]
It is the general rule that the laws are presumed to be legal and constitutional. Goldblatt v. Town of Hempstead, N.Y., 369 U.S. 590, 82 S.Ct. 987, 8 L.Ed.2d 130 (1962); Flemming v. Nestor, 363 U.S. 603, 80 S.Ct. 1367, 4 L.Ed.2d 1435 (1960). The burden is upon the person assailing the legality of a statute. Spears v. Honda, 51 Haw. 1, 449 P.2d 130 (1968); Koike v. Board of Water Supply, etc., 44 Haw. 100, 352 P.2d 835 (1960). This burden, I believe, the plaintiffs have failed to overcome.
Thus, I cannot agree that even under the additional requirements read into § 5-515 by the majority for the enactment of amendments to the general plan, the ordinances should be declared illegal and thus null and void.
I also disagree with the majority on the issue of laches.
If the ordinances are illegal because they were not enacted as required under the provision of the City Charter, can the defense of laches be applicable to this suit for a declaratory judgment to have the ordinances ruled illegal, null and void?[4]
If the ordinances are illegal, they are illegal, and laches, if there were on the part of the plaintiffs, will not make them legal.
NOTES
[1] There is in the record no explanation of the apparent disparity in acreage between Ordinance 2840 (46.922 acres) and Ordinances 2913 and 3131 (37.197 + 10.969 = 48.166).
[2] Under H.R.C.P. Rule 52(a) findings of fact and conclusions of law are unnecessary in summary judgments. This is because disputed issues of fact cannot be resolved on summary judgment. See 5 Moore's Federal Practice 2671 (2d Ed. 1968). Trial courts are not prevented from entering conclusions of law, however, and in the present case a clear statement of the conclusions of law in each judgment would have facilitated the appeal.
[3] The affidavit of a Lewers & Cooke public relations officer annexes a considerable number of newspaper clippings concerning the development. The earliest dated clipping which mentions Lewers & Cooke's participation was published on April 12, almost two weeks after Lewers & Cooke entered the development agreement.
[4] of the doctrine of laches requires not only the passage of time but an acquiescence  either express or implied  in the alleged wrong. * * * Since acquiescence must be predicated on knowledge  again, either express or implied  and since we disagree with the trial judge's conclusion as to this factor, we find laches to be no bar at this stage of the proceeding. * * * [Citations omitted]
Tracerlab, Inc. v. Industrial Nucleonics Corp., 313 F.2d 97 at 102 (1st Cir.1963).
[5] United States v. Bethlehem Steel Corp., 157 F. Supp. 877 at 879 (S.D.N.Y. 1958).
[6] The Charter of the City and County of Honolulu is appended to Volume 2 of HRS at p. 589. Section 3-204 can be found at p. 597.
[7] Section 4-908 of the first draft provided simply:

The General Plan shall show the general location, extent and character of streets, bridges, water ways, and other public ways; parks and open spaces; public buildings and structures; public utilites [sic] and terminals, whether public or privately owned; public housing, slum clearance, and redevelopment projects and areas; and any other physical public facility. The General Plan shall also include building zone districts and use zone districts.
The commission's second draft, § 4-907, shows the effect of the testimony quoted in the text above:
"General plan" means a long-range, comprehensive plan which serves as a guide for the future physical and economic development of the City. Such plan shall consist of a map of the City, a statement of development objectives based upon (1) land use elements, (2) transportation elements, (3) public facility elements, and (4) population density elements, and such supporting documentation and exhibits as are necessary. [Emphasis added]
[1] Pursuant to § 5-512(1) which provides that "the council shall adopt the general plan * * * by ordinance."
[2] Section 3-204 of the Charter reads in part:

1. No ordinance shall be amended, revised or repealed by the council except by ordinance. No resolution shall be amended, revised or repealed except by resolution but a resolution may be superseded by a subsequent ordinance.
[3] From the majority opinion as to necessity of studies to show before the general plan may be amended.
[4] The prayers in the complaint read:

"1. That after a hearing hereof, the Court enter an order declaring that said Ordinance Nos. 2840 and 2841 relating to amendment to the detailed land use map, and any existing and future zoning Ordinances including Ordinance Nos. 2913 and 3131 relating to the real property described in Exhibit "A" are null and void on the basis that the Defendant exceeded its Charter authority, either expressed or implied;
2. That the Court enter an order enjoining the Defendant from proceeding with the adoption of general plan amendments and zoning ordinances relating to the real property described in Exhibit "A" until such time as all of the mandatory planning provisions of the Charter have been enacted pursuant to the Charter; and
3. Such other relief as may be just and equitable."